## COMMERCIAL STANDARD INS. CO. v. BROCK.

### No. 5486.

Court of Civil Appeals of Texas. Amarillo.

Nov. 30, 1942.

Rehearing Denied Jan. 4, 1943.

field contract labor in Oklahoma. Immediately prior to the accident, which occurred on May 19, 1938, the appellee was engaged by such company as a helper or "swamper" in moving heavy oil field machinery in large trucks especially prepared for that purpose. He had worked only about two weeks in this capacity at the time of the accident, operating from his home at Seminole. On the occasion in question he was assisting in the moving of some oil field equipment from Garden City, Kansas, to Odessa, Texas, a distance of about 485 miles. He left his home in Seminole on May 18, 1938, went to Garden City and loaded the machinery, and then came back through the northwestern portion of Oklahoma and entered Texas at Higgins in Lipscomb County where the accident occurred. It became necessary to unload a part of the machinery at Higgins in order to comply with the then existing Texas truck laws. In the process of unloading the same, while the appellee was standing beside his truck with a piece of iron pipe which he was using as a prize bar, prizing at a tank which he and two other men were unloading, the tank slipped and in some manner caused the bar to strike the appellee in the frontal portion of his head immediately above his right eye. He received first aid treatment at Higgins and was later treated at Tulsa, Oklahoma, and at Seminole.

On September 26, 1938, the appellee filed his claim with the Industrial Accident Board of Texas and on November 14, 1938, he filed with the Board his own statement in which he described his disability as being total from May 9 to June 6, and partial for two weeks following June 6. On December 8, 1938, the Board made its final award, allowing a recovery for total incapacity from May 19 to June 5, and for 25% partial incapacity for four additional weeks, which amounted to a total of $49.-48. The appellee refused to accept the award and in due time filed his notice of appeal, but no suit was filed at that time. On November 18, 1939, he filed his application with the Board to have his claim reopened and reconsidered, as provided for in Section 12d of the above Article. On November 24, 1939, the Board entered an order refusing to reopen the claim. The appellee filed notice of his intention not to abide by the Board's order refusing to reopen, and on January 4, 1940, being the twenty-first day following such notice, he filed his suit by way of an appeal in the District Court of Lipscomb County. This

Underwood, Johnson, Dooley & Wilson, of Amarillo, for appellant.

Claud Briggs, of Oklahoma City, Okl., Roy Sansing, of Higgins, and F. P. Works, of Amarillo, for appellee.

FOLLEY, Justice.

This is a compensation suit in which the appellee, J. S. Brock, is the employe, J. E. Hilditch, Inc., the employer, and the appellant, Commercial Standard Insurance Company the insurance carrier. The suit primarily involves Section 12d of Article 8306, Vernon's Annotated Civil Statutes, relative to a change of condition of the claimant's disability.

The appellee resided in Seminole, Oklahoma. His employer was engaged in oil

suit was dismissed without prejudice on September 9, 1940.

On September 10, 1940, the appellee filed his second motion with the Board to have his claim reopened, in which he alleged permanent total incapacity accruing after November 24, 1939, the date of the former refusal of the Board to reopen his claim. This second application was likewise refused by the Board, notice of appeal duly given, and the present suit filed within due time, seeking recovery for total and permanent disability alleged to have arisen as a change of condition subsequent to November 24, 1939.

It is conceded by the parties that the Board's first order of the date of November 24, 1939, refusing to reopen the claim, from which there was no appeal, is res judicata of any right of the appellee to have his award reviewed upon conditions existing up to that time. The case was therefore tried solely upon the theory of a change of condition subsequent to November 24, 1939.

The trial was before a jury. In the light of the instructions given by the court, the findings of the jury upon various issues were substantially to the effect that the appellee sustained a personal injury on or about May 19, 1938, as a result of an accident while in the course of his employment for J. E. Hilditch, Inc., and that his physical condition resulting from such injury changed substantially for the worse after November 24, 1939, and before September 25, 1940, resulting in total and permanent incapacity; that his incapacity became total and permanent in August 1940; that there were employes of the same class as appellee, working substantially the whole of the year immediately preceding the injury of the appellee, with an average daily wage of $5.60. Upon these findings the court rendered judgment for the appellee for 282 weeks of compensation at $19.38 per week, beginning September 1, 1940, and extending through the remainder of the compensation period. With the interest on the accrued instalments and the discount for the unmatured instalments, the lump sum award amounted to $5,069.

The first complaint of the appellant is based upon the court's action in refusing to instruct a verdict in its behalf and in overruling its motion for judgment non obstante veredicto. In this connection appellant contends that, as a matter of law, the record does not reflect such a change of condition as to warrant a recovery under Section 12d of Article 8306.

We think the parties are agreed upon two facts with reference to the appellee's condition. One is that his condition has grown gradually worse since the accident on May 19, 1938, and the other is that he is now totally and permanently disabled within the meaning of the Compensation Law. At least, the testimony conclusively shows these two facts. The only real controversy remaining is whether his present total and permanent disability matured substantially before November 24, 1939, the date of the Board's first refusal to reopen his claim, from which order there was no appeal. The appellee naturally contends that the present incapacity accrued subsequent to such date, and the appellant contends to the contrary.

As we view the record, we think there is ample testimony in it to support the theory of each of the parties to this suit. However, since the jury adopted the appellee's theory and rejected the appellant's, we deem it sufficient to point out largely only such testimony as supports the jury's findings on this question.

The testimony of the appellee, as material here, was to the effect that in the summer or early fall of 1938, following his injury in May of that year, he tried to work in the oil fields on two occasions, but, due to severe headaches, he found he could not do the work; that this was before the final award made by the Board on December 8, 1938; that following December 8, he gradually got worse; that his right eye became weaker, his right arm and leg became numb and heavy; that by November, 1939, this numbness was very evident and he could notice a pulling to the right, though he could still get around; that from December 8, 1938, to November 24, 1939, he did no work except light jobs around a cafe and domino parlor; that he would carry out trash, bring in groceries, sweep floors, and wash dishes; that at the time of the trial he was still performing some of these light tasks; that after November, 1939, the numbness gradually increased until claimant could not work; that he experienced difficulty in picking up objects; that his body continued to draw to the right and he became unable to handle his right leg; that after November, 1939, his weight-lifting ability decreased and he could not stoop over; that by September, 1940, he would occasionally be confined to

his bed; that his headaches, vision, numbness, and tendency to draw to the side became worse; that a palsy or shaking of his hand was then developing; that in July, 1941, Dr. W. E. Jones, of Seminole, operated upon his head and for six weeks or two months he improved slightly, but the improvement ceased; that he had noted no improvement since that time; that at the time of the trial he could do no work at all except light tasks about the cafe and domino parlor; that he then had continued headaches and dizziness and possessed no control of his balance; that it was his opinion that during a part of the time following May 19, 1938, he could have done heavier work and that, initially, the thing that prevented him from working was his severe headaches which would develop when he exerted himself; and that as time went on, these headaches became worse and more frequent and that finally his general strength began to fail.

Dr. W. E. Jones testified by deposition that he had known the claimant for 14 years; that he treated him soon after his injury in May, 1938, at which time he observed a scalp laceration which had received medical attention; that he was unable to estimate the amount of disability at that time but suspected an injury to the brain and membranes, and this opinion he reported to the Industrial Accident Board at Austin on November 19, 1938; that he saw the claimant at frequent intervals up to October, 1939, and in these contacts he was confirmed in his original opinion; that on the latter date the claimant was complaining of constant severe headaches and pain in the right eye which increased upon exposure to the sun; that there was considerable drooping of the right eyelid which was interfering with his vision; that there was still an apparent indentation in the skull; that the drooping of the eyelid was apparently due to a nerve difficulty; that the symptoms, both objective and subjective, indicated that the headaches were due to a depressed fracture of the skull at the site of the injury and the probable excess formation of new bone produced by nature's repair of the fracture, causing pressure on the brain and membranes; that he continued to see the claimant from time to time until July, 1941; that he grew progressively worse and his symptoms became more pronounced; that additional symptoms manifested themselves after October, 1939, including a loss of sensation and numbness in his right arm and hand,

and marked limitation of ability to control the muscles of the right arm; that in the late spring or early summer of 1941, this impairment of the use of his right arm became more pronounced and the numbness, loss of sensation, and impairment of the use of his right leg became more evident; that in August, 1940, he examined the claimant again, finding weakness, a tremor in the right arm and forearm, constant headaches and dizziness, increased ptosis of the right eyelid and generalized increasing loss of weight, strength, muscletone and reflex controls; that at that time the claimant was totally unable to do ordinary manual labor, his condition having continued to grow steadily and progressively worse from October, 1939, to August, 1940; that he operated upon the claimant on July 31, 1941, removing a portion of his skull; that he found an increased density of the skull in the area of the injury; that this increased density was producing considerable pressure on the brain; that although claimant had received some relief from the operation, in his opinion he had received all the improvement he might expect from surgery, and he thought the claimant was still totally disabled and that he would never again be able to perform the work required of an ordinary laborer; that in his observations and treatment of claimant prior to November 24, 1939, he was "not certain about his ability to perform manual labor at that time"; that he was "not sure of the extent of claimant's disability at that time but felt that he was able to do some work"; that he thought the claimant was able to do some manual labor until about October 1939, but that after that date his condition grew worse so that by the latter part of August or the first of September, 1940, "I became convinced that he had become unable to do manual labor"; that there was a gradual change in his ability to work from time to time, from week to week, and from month to month, until now he is unable to do manual labor; and that whatever disability claimant had suffered since May 19, 1938, was attributable to the single injury he had received on such date.

Dr. Phil White, of Oklahoma City, testified in person that he first examined the claimant in September, 1939, and at that time, except for a scar on his head, he found very little symptoms; that at that time claimant had some slight loss of sensation to sharp and dull on the right side of his body and some slight loss of co-

ordination of his right arm and leg; that he saw him again in September, 1940, and that he was gradually losing the use of the right arm and leg; that there was a tremor beginning to develop in his right arm and hand; that he had lost weight and was not as active as in 1939; that the ptosis of the right eyelid did not develop until about December, 1940; that from September 1940, the claimant declined rapidly; that he then began losing weight and lost more use of his right arm and leg; that he saw him again in May, 1941, and at that time he could hardly get around by himself; that it was then his opinion some intercranial pressure was causing his trouble; that his tendency to pull to the right began in December, 1940, when he first noticed the ptosis of the right eyelid; that he examined him again in September, 1941, and he was then very weak and walking with a cane; that his operative scar was not then quite healed; that he showed some improvement after his operation but there was no further improvement in 1942; that in the last few months his condition was about the same as in December, 1941; that in a Rhomberg test claimant was very unsteady, falling to the right and backward; that he did not think there would be any more improvement; that claimant would never again be able to do the ordinary tasks of a workman or the ordinary types of manual labor; that the duration of the intercranial pressure is what caused the damage; that the claimant's permanent disability was greater now than in November, 1939; that in September, 1939, he could not find an "awful lot wrong with Mr. Brock"; that he then had some slight loss of sensation in the upper extremity and a little impairment of coordination; that he then thought claimant could have been working; that he thought at that time the claimant could have done considerable work, that is, any type of manual labor, such as driving a truck, farming, some oil field work or filling station work; that claimant's muscletone was good at that time; that claimant was then complaining he could not work, but "that was not my conclusion"; that he could see no reason for claimant's complaint about not being able to work at that time and could not see why he could not then do most ordinary manual labor; that he did not think any doctor could have diagnosed claimant's condition as early as September, 1939; that from his first examination in September, 1939, to September, 1940, there were defi-

nite signs of depreciation of claimant's general physical strength, but that the permanent damage had not developed when he first examined him; that, in fact, claimant's disability had then developed only to a point where he was beginning to get objective symptoms of the injury; and that in 1941, there was considerable paralysis of the right side of his body.

The above testimony, in our judgment, is amply sufficient to support the appellee's theory and the jury's findings to the effect that his present total and permanent disability accrued substantially subsequent to November 24, 1939, and that his condition, within the meaning of the Compensation Law, had changed from what it was prior thereto. Therefore, the appellee is not precluded from recovery by reason of his failure to prosecute an appeal from the Board's first order refusing to reopen his claim. Independence Indemnity Co. v. White et al., Tex.Com.App., 27 S. W.2d 529.

In construing laws similar to that of Section 12d of the above Article, the general rule as to res judicata seems to be "that a compensation award is an adjudication as to the condition of the injured workman at the time it is entered, and conclusive of all matters adjudicable at that time, but it is not an adjudication as to the claimant's future condition and does not preclude subsequent awards or subsequent modification of the original award upon a showing that the employee's physical condition has changed." 122 A.L.R. 557. In other words, the Board's adjudication of a physical condition is final as to the condition then existing, but it is not final in so far as it precludes the future course of the injury when something new appears therein, showing a different condition. Southern Drilling Co. et al. v. Daley et al., 166 Okl. 33, 25 P.2d 1082. However, since the purpose of the section of the statute in question is not to afford a means of correcting the errors made in the action of the Board, it follows that a continued incapacity of the same character for the same injury upon which the award was based is not such a change of condition as warrants a modification of the award. On the contrary, to obtain a modification of the award, the claimant's condition must have become substantially worse, and not that it has, in fact, always been worse than the Board found it to be. Winschel v. Stix, Baer & Fuller Dry Goods

Co. et al., Mo.App., 77 S.W.2d 488. Under these rules, we think the appellee's recovery is fully sustained, because the testimony supports the theory that his incapacity subsequent to November 24, 1939, was not of the same character as it was prior thereto, but was substantially worse, as the jury, in effect, found it to be.

The appellant next contends that the court erroneously placed the burden of proof upon it to establish that any incapacity of the appellee was only partial, and further erred in subjecting the appellant to the burden of proof to establish that appellee's condition had changed for the better. These assignments are based upon Special Issues 9 and 11, respectively, which, together with their answers, were as follows:

"Special Issue No. 9: Do you find, from the preponderance of the evidence, that such permanent incapacity of the plaintiff, if any, was, or is, total, or only partial? Answer by saying, 'Total,' or 'Only partial.' Answer: Total."

"Special Issue No. 11: Do you find, from a preponderance of the evidence, that after the date fixed by you in answer to Special Issue No. 8, that plaintiff's incapacity, if any, changed for the better or for the worse? Answer by saying, 'For Better,' or 'For Worse.' Answer: For worse."

It is apparent that these issues submitted disjunctively two inconsistent conditions, as provided in Rule 277, Texas Rules of Civil Procedure. The appellant makes no complaint as to the disjunctive form of the issues, nor does it contend that it was entitled to a separate submission of its defensive theories. The only objection is with reference to the burden of proof and to this objection we shall confine our discussion.

In so far as Issue No. 11 is concerned, there was no testimony from any witness, and no circumstances in the record, to indicate any change of condition for the better, within the meaning of the Compensation Law. The court was therefore unwarranted in submitting that portion of the question, but of this error only the appellee has the right to complain. The remainder of the issue properly places the burden of proof upon the appellee to show that his condition had changed for the worse.

With reference to Issue No. 9, we recognize the rule that a claimant "in order to recover for total disability must prove by preponderance of the evidence that his disability is not merely partial." Southern Underwriters et al. v. Boswell, 138 Tex. 255, 158 S.W.2d 280, 282. However, under the authority cited, that burden was discharged by the appellee in that portion of the issue and answer relative to total incapacity wherein the burden of proof was properly placed upon him. As was indicated in the Boswell case, the finding of total incapacity necessarily required the appellee to prove by a preponderance of the evidence that his disability was not merely partial, and therefore, "in this way, the insurance company's rights, in so far as the burden of proof on its defense of partial disability was concerned, were protected." Under the facts of this case, that was as far as the burden of the appellee extended. He was seeking no recovery for partial incapacity and his only interest therein was to so eliminate it as to justify a recovery for total incapacity, which was sufficiently accomplished in the issue submitted. This assignment is therefore overruled.

The appellant further asserts that the court erred in refusing to submit to the jury two of its requested issues, inquiring, respectively, if the appellee, prior to December 8, 1938, and prior to November 24, 1939, was claiming an incapacity total, or substantially so, in character. We think these requested issues were not material to this controversy. The actual condition of the appellee prior to November 24, 1939, is the true criterion governing this situation, and not what he claimed it to be. The fact that the appellee claimed total incapacity prior to November 24, 1939, merely went to the weight of his testimony and to the bona fides of his present claim of a change of condition, but in no manner limited the jurisdiction of the Industrial Accident Board to reopen his claim subsequent to such date. Indian Territory Illuminating Oil Co. v. State Industrial Commission et al., 185 Okl. 68, 89 P.2d 933. Moreover, the issues requested do not include the theory of permanent total incapacity which, of course, is not the same condition as temporary total incapacity. These assignments are therefore without merit.

The appellant also requested several issues of similar import, except for the dates, relative to the commencement of the appellee's incapacity and as to his

knowledge thereof. As typical of such issues, we quote the following:

"Did any incapacity which plaintiff may now have, attributable, if it is, to inter-cranial pressure, commence prior to November 24, 1939?"

"Did any incapacity plaintiff may now have, attributable to the 1938 accident, exist, to an extent known to. and recognized by plaintiff, substantially the whole of the time from December 8, 1938, to November 24, 1939?"

We think an affirmative finding upon these requested issues would not have defeated a recovery by the appellee and that there was no error in the court's action in refusing to submit them. As worded, these issues simply inquired if "any incapacity" which appellee now sustains commenced prior to November 24, 1939, and if any such incapacity existed to such an extent that the appellee knew about it. Certainly, some of the present total incapacity existed in the form of partial incapacity prior to November 24, 1939, and there is no doubt that the appellee knew all the time that he had sustained some incapacity. The requested issues, as framed, do not present the defensive theory elsewhere urged by appellant to the effect that all of the incapacity, or substantially all of it, accrued before November 24, 1939, and that appellee was cognizant of such facts prior to such time. Moreover, this latter theory and the appellant's present complaint about the refusal of these requested issues were substantially eliminated from the case by the court's instruction to the jury, at the request of the appellant, with reference to Issue No. 5 of the court's charge, which inquired as to the change of condition subsequent to November 24, 1939. Such instruction was as follows: "In connection with special issue No. 5 contained in the court's main charge, you are instructed that an increase in the outward evidence of any inter-cranial pressure to which any existing incapacity might be attributable would not constitute, in law, the change of condition here inquired about. In this connection, you are further instructed that, if prior to November 24, 1939, the plaintiff had any substantial incapacity to work, whether total or not, and if by said date it could be reasonably anticipated either that such incapacity might increase or that an incapacity substantially the same might extend into the future, either permanently or for some unknown period of time, then, in law, there would be no change of condition such as is here inquired about."

In its final assignment the appellant attacks the method employed in this case of determining the compensation rate. The testimony was undisputed that the appellee had not worked substantially a whole year preceding his injury in the employment he was then engaged upon, but there was testimony to the effect that others had so worked. Therefore, the wage rate was submitted, first, under subsection 2 of section 1 of Article 8309, Vernon's Annotated Civil Statutes, and, in the alternative, under subsection 3 of section 1. The alternative issues were not answered, the court having directed the jury to answer the same only if negative findings were made to the preceding issues under subsection 2. In response to the issues submitted under subsection 2, the jury found that there were employes of the same class who had worked substantially the whole year preceding the injury and that the average daily wage or salary of such employes was $5.60. Based upon these findings, the court fixed the weekly compensation rate at $19.-38. It is obvious that in arriving at this amount, the court multiplied $5.60, the average daily wage or salary, by 300, which amounted to $1,680 as the average annual wages, divided this amount by 52 to ascertain the average weekly wage of $32.30, and took 60% of the last amount to arrive at the weekly compensation rate of $19.38.

The evidence reveals that there was no one engaged in hauling oil field equipment in Lipscomb County or in that vicinity. The submission and findings on the wage question were based upon the testimony of George Poling, who also lived at Seminole and was engaged in the same character of work as the appellee, though he worked for a different concern, the Carter Oil Company. He performed duties similar to those of the appellee. He, and other similar employes of the Carter Oil Company, helped to move heavy oil field machinery with large trucks, which required both experience and skill. It was not like the ordinary trucking which was carried on in Lipscomb County and vicinity. Poling operated between various points over the State of Oklahoma and from Oklahoma into and across other States. He had hauled oil field equipment through Kansas and through Garden City and that vicinity. He

had also hauled such equipment through several of the towns in Oklahoma where the appellee was performing similar duties for his employer. He knew the appellee and they saw each other often in their respective operations. Poling testified that for his services "they just paid us $140. a month the 10th of every month." He and his associates thus received a straight salary of $140 a month for the year immediately preceding the appellee's injury, which amounted to $1,680 as actual earnings for the whole year. During such time, due to what he termed the NRA, Poling and his fellow employes worked only 234 days, or an average of 4½ days per week. However, he worked the whole year and was subject to call seven days out of each week. Apparently, the jury, in arriving at $5.60 as the average daily wage, divided Poling's actual annual earnings of $1,680 by 300.

The appellant contends, first, that the wages or salary of Poling was not a correct measure because his work was not performed in the same or a neighboring place as that of appellee, and asserts that the phrase "in the same or neighboring place" refers to the place of the accident, in this case, Lipscomb County, and not to some other place where the appellee or Poling may have worked. Under the facts presented, we think such a restricted meaning of this phrase is not applicable. The expression "neighboring place" is obviously a relative term and the purpose and import of its use are to be known from the context. What would not constitute a neighboring place in one instance might do so in another. This is evident in the answer the Saviour gave to the lawyer who asked the question, "Who is my neighbor?" The response was the familiar parable of the good Samaritan which, no doubt, enlarged the vision of the questioner relative to the meaning of the term as applied to his duty to his fellow man. Luke x:25–37. Therefore, the circumstances under which the term is applied must be considered in each case. In this case we have extraordinary circumstances. The work of the appellee and of Poling and his associates was of an unusual type and character and extended over considerable territory, including several States. It was not of a local character, and, with the exception of appellee's passing through the place of the accident, so far as the record reveals, such work was not performed in Lipscomb County or in that immediate vicinity. Under such conditions, we are of the opinion that the meaning of the term must be given a larger and a more appropriate interpretation.

Secondly, the appellant asserts that the testimony does not support the theory that Poling had worked substantially the whole year preceding the injury. This contention is based upon the fact that he worked only 234 days of the year or an average of 4½ days each week. We think this contention has been expressly overruled in Texas Employers Ins. Ass'n v. Clack, 134 Tex. 151, 132 S.W.2d 399, 401, wherein the Supreme Court held that where an employe, in the employment of another for a full year prior to injury, was paid an annual salary or monthly salary for full twelve months and, by reason of the conditions under which he worked, he did not actually work but 234 days, the employe would be regarded as having worked substantially the whole year so as to make applicable the statutory rule of dividing his annual salary or earnings by 52 in order to determine his applicable weekly wages. In the instant case, dividing the annual salary of Poling by 52 results in the sum of $32.30, which was the same weekly wage used by the court as based upon the jury finding of $5.60 average daily wage or salary. These assignments are therefore overruled. Eagle Picher Mining & Smelting Co. v. Lamkin et al., 189 Okl. 463, 117 P.2d 519.

In our holding on the above issue, we note what appears to be a typographical error in the pleadings of the appellee as shown by the transcript. We mention this only because it might involve fundamental error even if presented for the first time in the Supreme Court. In his pleading with reference to subsection 2 of section 1 of Article 8309, the appellee alleges, as shown by the transcript, that the daily wage or salary of such other employes was $5.38, instead of $5.60 found by the jury. Following such allegation, however, he further alleges that by reason of such daily wage or salary, his "average annual wages, weekly wages and consequent weekly compensation rate, in terms of law, are $1680.-00, $32.30 and $19.38, respectively." If his premise as to daily wage is correctly stated as shown by the transcript, his conclusions based thereon are incorrect, and the recovery necessarily would have to be reduced to come within the bounds of his actual al-

legations. Since the appellant has not raised this question, we are assuming that the transcript contains a typographical error and that the pleading actually alleged $5.60 as the average daily wage rate. If we are in error in this respect, we request appellant to call this matter to our attention. Otherwise, we shall presume that our assumption is correct.

We have carefully examined all of the assignments of the appellant and, finding no reversible error, the judgment is affirmed.